**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

MARKSMAN SECURITY CORPORATION, a
Florida for Profit Corporation,

      Plaintiff

vs.                                   CASE NO: 0:19-cv-62467-AMC

P.G. SECURITY, INC. d/b/a Platinum Group
Security, a Florida For Profit Corporation, and
CAMERON UNDERWOOD, individually

      Defendants.

_____/

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AND INCORPORATED MEMORANDUM OF LAW**

E. COLIN THOMPSON
Florida Bar No.: 0684929
colint@sblfirm.com
loisf@sblfirm.com
heatherw@sblfirm.com
SEAN M. McCLEARY
Florida Bar No.: 117832
seanm@sblfirm.com
paulam@sblfirm.com
**SMOLKER, BARTLETT, LOEB,**
**HINDS & THOMPSON, P.A.**
100 North Tampa Street, Suite 2050
Tampa, Florida 33602
Telephone: 813-223-3888

***Attorneys for Plaintiff, Marksman***
***Security Corporation***

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

**SUMMARY OF THE PERTINENT FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

**MEMORANDUM OF LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    **I.** **Marksman is Entitled to Summary Judgment Against Platinum on Count I – Federal Anti-Cybersquatting Under 15 U.S.C. § 1125(d)** . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        *A.* *Marksman owns the Marks* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        *B.* *The Marks are distinctive and, therefore, valid* . . . . . . . . . . . . . . . . . . . . . . . . .5

        *C.* *The Infringing Domains are "identical or confusingly similar" to Marksman's word mark and domain markskmansecurity.com.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        *D.* *Platinum had a bad-faith intent to profit from Marksman's Marks* . . . . . . . . . . . 9

            **1.** **Eight of the nine statutory factors are satisfied** . . . . . . . . . . . . . . . . . . . . . . 10

            **2.** **Additional evidence of Platinum's bad faith intent abounds** . . . . . . . . . . . . 11

        *E.* *Marksman is entitled to an award of Platinum's profits* . . . . . . . . . . . . . . . . . . .13

        *F.* *Marksman is entitled to a permanent injunction against Platinum pursuant to 15 U.S.C. § 1116(a)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

    **II.** **Marksman is Entitled to Summary Judgment Against Platinum and Underwood on Marksman's Claims Regarding the Fake Reviews, Counts II, IV and VI** . . . . . . . . 17

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Plaintiff, Marksman Security Corporation ("**Marksman**"), through undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, moves for Summary Judgment against Defendants, P.G. Security, Inc. d/b/a Platinum Group Security ("**Platinum**") and Cameron Underwood ("**Underwood**").   In support, Marksman relies on the parties' Joint Statement of Undisputed Facts [ECF No. 137, the "**JSUF**"], Marksman's Statement of Material Facts [ECF No. 158, the "**SMF**"] and the argument set out below:

## INTRODUCTION

Since his departure from the employ of Platinum in 2003, Mr. Mark Radi and his business, partner, Mr. Zeke Kaufman, have built Marksman into a premier security services company now operating in fifteen states with over 6,500 employees.  For over fifteen years, Platinum—a small, local, private security company that purports to serve the South Florida market—has considered Marksman to be its "lead competitor."  Historically, Platinum and its executives never outwardly appeared to unfairly compete against Marksman.  That all changed in the spring of 2018 when the irrebuttable evidence reveals a shift in Platinum's business behavior, including, among other things: (i) purchasing and redirecting to Platinum's website six domain names containing Marksman's federally registered word mark, "Marksman"; (ii) creating a page on Instagram using Marksman's federally registered design mark to pose as Marksman and posting disparaging content about Marksman; and, (iii) along with co-defendant Cameron Underwood, paying for and posting online fake reviews positive for Platinum and negative for Marksman.

These unethical practices paid Platinum a handsome return.  Court-ordered financial records from Platinum reveal its sales rocketed up and total *$61,512,285.02* during the time of Platinum's conduct.  [JSUF ¶¶ 15-17].  Aside from seeking to capitalize on the superior brand and name recognition Marksman enjoys in the marketplace, one rightfully asks: Why did Platinum engage in such unethical and deceitful business behavior? A text message recovered through a court-ordered forensic extraction reveals Platinum's animosity and intent:

**"Zeke and Mark are cum stains that need to be wiped out"**

[SMF ¶ 24]. This statement from Platinum's Vice President, Mr. Rony Joseph, to its owner, Kevin Van Middlesworth, crystalizes Platinum's malicious campaign built on behaviors that are contrary to the American way of fair and honest competition.

Faced with the facts described below, this Court should have no hesitation in granting summary judgment to rightfully compensate Marksman for the damage Platinum caused its

business and to deter Platinum (and any other similarly inclined business) from ever again engaging in the type of attacks and deceit Marksman has uncovered and endured.  Summary judgment on Counts I, II, IV, and VI of the Second Amended Complaint is absolutely warranted.

## <u>SUMMARY OF THE PERTINENT FACTS</u>

In March 2018, Platinum put into action a plan it had been conceiving for months to take business from its competitor, Marksman, by, among other things, using Marksman's marks on the internet to redirect business to Platinum.  [SMF ¶¶ 26-29].  First, on March 29, 2018, Platinum purchased the following six internet domain names containing Marksman's word mark "MARKSMAN"[1] and terms confusingly similar to it:

*Marksmansecurity.net*  *Markmansecurity.com*  *Marksmensecurity.com*

*Marksmensecurity.org*  *Marksmensecurity.info*  *Marksmensecurity.net*

(collectively, the "**Infringing Domains**").[2]  [JSUF ¶ 6; SMF ¶¶ 28, 29 and Exhibit 1 at Ex. J (forwarding Platinum's registration of the Infringing Domain Name to Platinum's website designer and remarking "I think you can see where Kevin [Van Middlesworth] is going with this . . .LOL")].  Platinum then redirected traffic from the Infringing Domains to Platinum's own website.  [SMF ¶¶ 29, 30].  When asked why it did so, Mr. Joseph candidly testified: "**I wanted to drive traffic to our website,**" *id.* ¶ 32, and admitted the campaign was "**our way of redirecting some business our way,**" *id.*

In July 2018, Platinum created an Instagram account with the username "markmansecurity" (the "**Imposter Instagram**"). [JSUF ¶ 10, 11; SMF ¶ 36].  Platinum used a pirated copy of Marksman's design mark in the header to make the account appear as if it was Marksman's official account and posted disparaging content about Marksman:

---

[1] Marksman also holds the design mark: MARKSMAN◉. [SMF ¶ 7]. Together with Marksman's word mark, they are collectively referenced in this Motion as, the "**Marks**."

[2] The Infringing Domains are

Marksmansecurity.net    Markmansecurity.com    Marksmensecurity.com
Marksmensecurity.org    Marksmensecurity.info    Marksmensecurity.net



[JSUF ¶ 11; SMF ¶¶ 37, 39]. To conceal it was behind the Imposter Instagram, Platinum created a Google Gmail account, markraditampa@gmail.com, impersonating "Mark Radi" who lived in "Tampa" (the "**Imposter Gmail**") and used it to register the Imposter Instagram.  [JSUF ¶ 10; SMF ¶¶ 35, 36].

Upon discovering the Imposter Instagram in October 2018, Marksman initiated a Pure Bill of Discovery Action in the Ninth Judicial Circuit to identify the true owner of the Imposter Instagram.[3] When deposed in the Bill of Discovery Action, Platinum's corporate representative lied, disclaiming all knowledge of the Imposter Instagram. [SMF ¶ 55]. Nevertheless, Marksman was able to confirm Platinum was behind it. In the process, Marksman discovered the Infringing Domains. Thereafter, Marksman initiated this action in October of 2019.  [ECF No. 1]

Platinum's disregard for fair competition and decency continued after Marksman filed its lawsuit against Platinum.   In January 2020, Platinum engaged Cameron Underwood to pay acquaintances and other people who were not Platinum clients $10 to post completely fake positive online reviews about Platinum, and likely negative online reviews about Marksman, on Google. [SMF ¶¶ 44-52].   After discovering these additional acts of unfair competition, Marksman amended its complaint to add claims regarding them.  [ECF No. 49].

Platinum's bad acts continued, nonetheless. As set out in detail in Marksman's motion seeking extreme spoliation sanctions [ECF No. 136], during this litigation Platinum, among other things: (i) intentionally deleted the Imposter Instagram "on advice of counsel" without preserving any of its contents; (ii) allowed the Imposter Gmail connected to the Imposter Instagram to be forever deleted without ever searching or preserving the contents of it because, according to Mr.

---

[3] *Marksman Security Corporation v. marksmansecurity,* Case No. 2019-CA-005447-O, in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida (the "**Bill of Discovery Action**"). [SMF ¶ 54].

Joseph "I don't want to"; and, (iii) deleted texts and instant messages from Mr. Van Middlesworth's and Mr. Joseph's phones.  *See id.*[4]

Platinum continued its bad conduct because it was being financially rewarded for it.  Just three and a half months after registering and redirecting traffic from the Infringing Domains, Mr. Van Middlesworth bragged via text message Platinum had taken from Marksman "6 accounts in 60 days." [SMF ¶ 56]. Between March 2018, when it first registered the Infringing Domains, through December 2020, Platinum's revenue increased over 50%, and totaled $61,512,285.02. [JSUF ¶¶ 15-17].  To deter Platinum and others from this type of conduct and to compensate Marksman, Platinum must now disgorge its ill-gotten gains.

## MEMORANDUM OF LAW

I.     **Marksman is Entitled to Summary Judgment Against Platinum on Count I – Federal Anti-Cybersquatting Under 15 U.S.C. § 1125(d)**

The "Anti-Cybersquatting Consumer Protection Act" ("**ACPA**"), 15 U.S.C. § 1125(d), provides, in part, a "person shall be liable in a civil action by the owner of a mark . . . [if] that person . . . has a bad faith intent to profit from that mark . . . and . . . registers, traffics in, or uses a domain name that . . . in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark."  *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 778–79 (11th Cir. 2015) (quoting 15 U.S.C. § 1195(d)).  The ACPA "creates civil liability for the cybersquatting of any mark ('famous' or not)." 5 McCarthy on Trademarks and Unfair Competition ("**McCarthy**") § 25A:50 (citing 15 U.S.C.A. § 1125(d)). "In the Cybersquatting context, 'confusingly similar' means that the plaintiff's mark and the defendant's domain name are so similar in sight, sound or meaning that confusion is likely." *Id.* (quoted in *Heron Dev. Corp. v. Vacation Tours, Inc.*, 2017 WL 5957743 * 6 (S.D. Fla. Nov. 30, 2017). "The Act was intended to prevent 'cybersquatting,' an expression that has come to mean the bad faith, abusive registration and use of the distinctive trademarks of others as Internet domain names, with the intent to profit from the goodwill associated with those trademarks." *Shields v. Zuccarini*, 254 F.3d 476 (3d Cir. 2001) (affirming summary judgment on 'Cybersquatting' claim where plaintiff

---

[4] By its Motion for Sanctions, Marksman asks the Court to enter default judgment against Platinum on each of Marksman's claims related to the Imposter Instagram (Counts III, V, and VII) and to presume in considering this Motion for Summary Judgment, and instruct the jury at the trial of this matter (if trial is necessary), the text messages deleted from Mr. Joseph's phone would have been unfavorable to Platinum on the remainder of Marksman's claims.  [ECF No. 136, at p. 20].

registered five variations of the plaintiff's website using misspellings of the plaintiff's name).  One form of cybersquatting occurs where, as here, "the cybersquatter 'intend[s] to profit by diverting customers from the website of the trademark owner to the defendants' own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's.'" *Jysk Bed'N Linen*, 810 F.3d at 774 (quoting *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1247 (11th Cir. 2009)).

### A.  *Marksman owns the Marks.*

Marksman has used the "Marksman" word mark and red shield design mark since its founding in 2003.  [SMF ¶ 5]. Platinum admits this fact.  [SMF ¶ 13].  The Marks, including the word mark "Marksman" were registered to Marksman on the Principal Register of the United States Patent and Trademark (the "**USPTO**") on October 16, 2018 (the word mark) and May 21, 2019 (the design mark) after Marksman filed an application for registration on March 14, 2018. [SMF ¶¶ 7-10].  A registration on the Principal Register, as here, "provides *prima facie* evidence of, *inter alia,* the registrant's ownership and exclusive right to use the marks, 15 U.S.C. § 1057(B), as well as proof of the continual use of the marks dating back to the filing date of the applications for registration." *Victoria's Cyber Secret Ltd. P'Ship v. V. Secret Catalogue, Inc.*, 161 F. Supp. 2d 1339, 1349 (S.D. Fla. 2001).  "Furthermore, a Principal Register registration is constructive notice of a claim or ownership so as to eliminate any defense of good faith adoption."  *Id.* (citing 15 U.S.C. § 1072).[5]  Accordingly, Platinum cannot dispute Marksman owns the Marks and was continually using them prior to the time Platinum registered the Infringing Domains.

### B.  *The Marks are distinctive and, therefore, valid.*

"To be valid, a trademark must be 'distinctive'—that is, it must 'serve the purpose of identifying the source of . . . goods or services,' not just the goods and services themselves." *Engineered Tax Srvcs., Inc. v. Scapello Consulting, Inc.*, 958 F.3d 1323, 1327 (S.D. Fla. 2020) (quoting *Welding Servcs., Inc. v. Forman*, 509 F.3d 1351, 1357 n. 3 (11th Cir. 2007)).  Marksman's Marks are "distinctive." Even Platinum admits in the private security market, "people understand 'Marksman'" and its red shield logo "to mean Marksman Security."  [SMF ¶ 14].

"Distinctiveness" is a function of a mark's "strength."  *Id.* Marks are classified into four categories, "in descending order of strength: (1) 'fanciful' or 'arbitrary,' (2) 'suggestive,' (3)

---

[5] As such, Platinum cannot rely, and Marksman is entitled to summary judgment, on Platinum's third affirmative defense asserting "good faith."  [ECF No. 60 p. 3].

'descriptive,' and (4) 'generic.'" *Eng'd Tax Srvcs.*, 958 F.3d at 1327 (citing *Royal Palm Properties, LLC v. Pink Palm Properties, LLC*, 950 F.3d 776, 783 (11th Cir. 2020)). "'[A] mark can be 'distinctive' in one of two ways: It can be 'inherently distinctive, or it can 'acquire' distinctiveness over time.'" *Id.* (quoting *Royal Palm*, 950 F.3d at 782). "Fanciful," "arbitrary" and "suggestive" marks are "inherently" distinctive and, as such, "no proof of secondary meaning is necessary." *Royal Palm*, 950 F.3d. at 783 (providing as an example of a "suggestive" mark: "'Igloo' cooler—the name is real word that bears only an oblique relationship to the product").

Marksman's Marks are "suggestive" and, therefore, "no proof of secondary meaning is necessary." *See Royal Palm*, 950 F.3d. at 783. There are two tests that work in tandem to distinguish "suggestive" from "descriptive" marks: the "imagination" test and the "third-party-use test. *Id.* Under the "imagination test," "[a] mark is merely descriptive, rather than suggestive . . . if 'the customer who observes the term can readily perceive the nature of the plaintiff's services, without having to exercise his imagination.'" *Id.* (quoting *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp), E.C.,* 931 F.2d 1519, 1524 (11th Cir. 1991). As McCarthy explains:

> The more imagination that is required on the potential customer's part to get some direct description of the product from the designation, the more likely the designation is suggestive, not descriptive. While a descriptive term directly and clearly conveys some information about the ingredients, qualities or characteristics of the product or service, the "suggestive" term only indirectly hints at these things.

McCarthy § 11:67 (citing *PlayNation Play Systems, Inc. v. Velex Corporation*, 924 F.3d 1159, 1166 (11th Cir. 2019) (The mark GORILLA for children's outdoor playground equipment was "not designed for or used by gorillas"—the mark was "suggestive" because it required "some imagination" to see that it implied that the equipment was strong and durable); *see also Royal Palm,* 950 F.3d at 783 (providing as an example of a "descriptive" mark "an eyeglasses store called 'Vision Center.'"). "If one must exercise 'mature thought or follow a multi-stage reasoning process' to determine attributes of the product or service, then the term is suggestive, not descriptive." McCarthy § 11:67.[6]

Under the "third-party-use" test, courts "ask whether competitors would be likely to need the terms used in the trademark in describing their products." *Eng'd Tax Srvcs,* 958 F.3d at 1332.

---

[6] McCarthy further explains: "If the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness." McCarthy § 11:67

"If a competitor 'need[s]' the mark to describe its own product, the reasoning goes, it must not be distinctive of the mark holder's product." *Id*

Here, customers who view either the term "Marksman" or the red shield logo cannot "readily perceive the nature of the plaintiff's services"—private security services—"without having to exercise [their] imagination." *See Eng'd Tax Srvcs.,* 958 F.3d at 1328. There is nothing about the mark "Marksman" or the red shield logo that "directly and clearly conveys some information about the . . . qualities or characteristics of" private security services and, therefore, the Marks cannot be "descriptive." *See* McCarthy § 11:67. Rather, "mature thought" and a "multi-stage reasoning process" is required for a customer to get from the word mark "Marksman" or the red shield logo to the services of Marksman—private security services. *Id.* "[S]ome imagination" is needed to see the Marks imply private security services. *See PlayNation Play Systems,* 924 F.3d at 1166. Moreover, no competitor in the private security industry "needs" to use, and there is no known private security company using, the term "Marksman" to describe its private security services. [SMF at ¶¶ 15, 16]. Accordingly, application of the "imagination test" and the "third-party-use" test confirm the Marks are "suggestive." *See Eng'd Tax Srvcs.,* 958 F.3d at 1332; *Royal Palm*, 950 F.3d at 783; McCarthy § 11:67.

If there could be any doubt the Marks are suggestive, the federal registration of the marks ends that doubt. The USPTO's registration of the Marks entitles Marksman to "a presumption of either inherent or acquired distinctiveness, depending on the ground on which registration was obtained." *See Eng'd Tax Srvcs.,* 958 F.3d at 1326 (citing *Royal Palm,* 950 F.3d at 784). Like the mark holder in *Eng'd Tax Srvcs.,* when Marksman applied for registration of the Marks with the USPTO, "it wasn't required to—and did not—provide evidence of any acquired secondary meaning." *Id.;* SMF ¶ 8. "Accordingly, and as a result of the USPTO's registration, the [Marks are] presumed to be inherently distinctive and thus, at least suggestive." *Id.* (emphasis supplied) (citing *Royal Palm,* 950 F.3d at 784). As such, Marksman has "'no burden to come forward with any affirmative evidence' that its mark [is] inherently distinctive; 'to the contrary, [Platinum] [has] the burden to prove otherwise,'" by a "preponderance of the evidence." *Id.* at 1328 & n. 8 (quoting *Royal Palm* 950 F.3d at 785).

Platinum cannot satisfy its burden to prove by a preponderance of the evidence the Marks are *not* distinctive. The only purported evidence Platinum has disclosed in this case to challenge the distinctiveness of the Marks is an opinion of its proffered expert, Frank McBride. However,

for the reasons set out in Marksman's *Daubert* Motion to Exclude Frank McBride and Related Survey Evidence, that evidence is not reliable or relevant and should be excluded. [ECF No. 135].[7]

Accordingly, there is no genuine issue as to any material fact regarding whether Marksman's Marks are distinctive and entitled to trademark protection.

### C. The Infringing Domains are "*identical or confusingly similar*" to Marksman's word mark and domain *marksmansecurity.com*.

"A reasonable interpretation of conduct covered by the phrase 'confusingly similar' is the intentional registration of domain names that are 'confusingly similar' to distinctive or famous marks." *Shields*, 254 F.3d at 484. In *Shields*, the plaintiff marketed cartoons under the names "Joe Cartoon" and "The Joe Carton Co." and operated the website *joecartoon.com*. *Id.* at 479. The defendant registered five website variations on the plaintiff's site: *joescartoon.com, joecarton.com, joescartons.com, joescartoons.com* and *cartoonjoe.com* on which he sold advertisements. *Id.* at 479-480. The defendant admitted he registered domain names, including the ones at issue, "because they are likely misspellings of famous marks or personal names." *Id.* The Court concluded, "the strong similarity between these domain names and joecartoon.com persuades us that they are 'confusingly similar.'" *Id.; see also Jysk Bed'N Linen*, 810 F.3d at 778 (finding "there is no serious dispute that *bydesignfurniture.com, bydesignfurniture.org, bydesignfurnitures.com* and *bydesign-furnitures.com* are identical or at least confusingly similar to [the plaintiff's] marks *bydesignfurniture.com* and By Design."); *PetMed Express, Inc. v. MedPets.com, Inc.*, 336 F. Supp. 2d 1213, 1219 (S.D. Fla. 2004) (finding the defendant's registered domains *MedPets.com* and *1888MedPets.com* "are confusingly similar" to the plaintiff's domains *1888PetMeds.com, PetMeds.com, 1800PetMeds.com,* and *PetMedExpress.com* "as they simply

---

[7] As set out in Marksman's *Daubert* Motion, Mr. McBride's opinions and his survey are not relevant because they do not go to any issue the fact finder should consider. [ECF No. 135 at pp. 7-10]. Because the Marks are suggestive, "no proof of secondary meaning," on which Mr. McBride purports to opine, is required. Moreover, "a district court should not freely substitute its opinion for that of the USPTO because a decision to register a mark, without requiring evidence of secondary meaning, is 'powerful evidence that the registered mark is suggestive and not merely descriptive.'" *U.S. Search, LLC v. U.S. Search.com*, 300 F.3d 517 (4th Cir. 2002)) ("With the certificate of registration, 'the registrant obtains prima facie evidence that its mark is not generic in the eyes of the relevant public, see 15 U.S.C. § 1064(3), and that its mark is not 'merely' descriptive, but at a minimum is descriptive and has obtained secondary meaning, see 15 U.S.C. § 1052(e).'" (emphasis in original) (quoting *RFE Indus., Inc. v. SPM Corp.* 105 F.3d 923, 926 (4th Cir. 1997)).

interchange the words 'Meds' and 'Pets'"); *Victoria's Cyber Secret,* 161 F. Supp. 2d at 1353 (finding "the Plaintiff's four domain names *victoriasesectret.com, victoriassexsecret.com, victoriasexysecret.com,* and *victoriassexysecret.com*, are misspellings of the Defendants Victoria's Secret's trademark name and website, *victoriassecret.com*" and "confusingly similar" to the mark, and entering summary judgment in favor of the defendant on its Cybersquatting counterclaims).

Here, as in *Shields*, *Jysk Bed'N Linen*, *PetMet Express, Inc.*, and *Victoria's Cyber Secret,* the Infringing Domains are intentional misspellings of Marksman's word mark "Marksman" and its registered domain, *marksmansecurity.com*. When asked why Platinum registered the Infringing Domains, Mr. Joseph, Platinum's corporate representative, candidly explained:

A.   First, they were available **and I wanted to drive traffic to our website.**

Q.   In what way?

A.   **If anyone was looking for a misspelled version of Marksman Security, so they would find our website or they would find our – our URL also**.

Q.   So I get it.  So the idea was, you got a consumer, they go to a web browser, they're looking for Marksman, but they type it in wrong.  They go to that domain and then they get redirected to Platinum's website; is that correct?

A.   Correct

[SMF ¶ 32].

In other words, Platinum expressly intended the Infringing Domains would be "confusingly similar" to Marksman's word mark and its domain *marksmansecurity.com*.

### D. Platinum had a bad-faith intent to profit from Marksman's Marks.

The ACPA "provides a list of nine factors that may be considered by the court when determining whether the defendant 'ha[d] a bad faith intent to profit from th[e] mark.'" *Jysk Bed'N Linen,* 810 F.3d at 775.[8]   The Court may consider those factors on summary judgment.  *Id.*

---

[8] Those factors are: (1)Whether the defendant has a 'trademark or other intellectual property rights' in the domain name;' (2) Whether the domain name refers to the legal name of the defendant;' (3) Whether the defendant ever used the domain name 'in connection with the bona fide offering of any goods or services;' (4) Whether the defendant has a 'bona fide noncommercial or fair use of the mark in a site accessible under the domain name;' (5) Whether the defendant has an 'intent to divert consumers' from the mark owner's website to his own, either for commercial gain 'or with the intent to tarnish or disparage the mark,' when that diversion could cause harm to the mark owner's goodwill; (6) Whether the defendant offers to transfer or sell the domain name for financial gain when he has not used or had an intent to use the domain name in connection with 'the bona fide offering of any goods or services;' (7) Whether the defendant provides 'material and

(affirming district court's grant of a temporary injunction and summary judgment in favor of trademark holder after finding five of the nine statutory factors met); *see also Shields*, 254 F.3d at 484-85 (affirming summary judgment concluding the defendant's "conduct satisfies a number of th[e] factors" and, therefore, "[t]here was sufficient evidence for the district court to find that [defendant] acted with a bad faith intent to profit when he registered and used the five domain names at issue here"). "The Court," however, "is not limited to the nine listed factors in determining whether or not the bad faith criteria has been met," but rather, "may consider all relevant factors." *Victoria's Cyber Secret*, 161 F. Supp. 2d at 1347. Here, Platinum's bad faith is shown by eight factors and more.

### 1. Eight of the nine statutory factors are satisfied.

First and foremost, factor five—"whether the defendant ha[d] an 'intent to **drive customers**' from the mark owner's website to his own' . . ."— is easily satisfied. *See* 15 U.S.C. §1125(d)(1)(B)(i)(V). Platinum readily admitted the reason Platinum purchased the Infringing Domains and redirected them to Platinum's own website was "***to drive traffic to our website***" and doing so was "***our way of redirecting some business our way***." [SMF ¶ 32].

Factor eight—whether the defendant acquired multiple domain names it knows are identical or confusingly similar to distinctive marks—is met. *See* 15 U.S.C. §1125(d)(1)(B)(i)(VIII). Platinum registered six separate domain names each *intentionally* containing either a term identical or confusingly similar to Marksman's word mark "Marksman." [JSUF ¶ 11; SMF ¶ 31].

Factor four is likewise met as Platinum did not have any "bona fide non-commercial or fair use" of Marksman's Mark "in a site accessible under" any of the six Infringing Domains. *See* 15 U.S.C. §1125(d)(1)(B)(i)(IV). Rather, there was no website accessible at any of the six Infringing Domains; instead, they were programmed to redirect all traffic to Platinum's own website and were not "utilized for any other purpose." [JSUF ¶ 8; SMF ¶ 33]. Moreover, like the defendant in *Victoria's Cyber Secret*, Platinum "completely incorporated" Marksman's word mark into all six

---

misleading false contact information when applying for the registration of the domain name' or the defendant 'intentional[ly] fail[s] to maintain accurate contact information'; (8) Whether the defendant acquired multiple domain names that the defendant knows are identical or confusingly similar to distinctive marks; and, (9) Whether the mark is distinctive or famous. *Jysk Bed'N Linen*, 810 F.3d at 775 (quoting 15 U.S.C. § 1125(d)(1)(B)(i)).

of the Infringing Domains, intending to use them "for commercial gain"; "such use is not noncommercial or fair."  161 F. Supp. 2d at 1347.

Further still, factors one through three are satisfied.  Platinum never had any "trademark or other intellectual property rights" to the Infringing Domains, none of the Infringing Domains refer to the legal name of Platinum, and Platinum had never before used the Infringing Domains 'in connection with the bona fide offering of any goods or services." *See* 15 U.S.C. §1125(d)(1)(B)(i)(I-III).  Indeed, Platinum admitted it was aware Marksman had been using its Marks for many years and Platinum never had any license or other permission to use Marksman's Marks.  [SMF ¶¶ 13].

Factor seven is also satisfied.  When registering the Infringing Domains, Platinum provided "material and misleading false contact information." 15 U.S.C. §§ 1125(d)(1)(B)(i)(VII).  Platinum registered each of the Infringing Domains using a "proxy" for registration to disguise Platinum was in control of each Infringing Domain.  [SMF ¶ 34].

Finally, as set forth above, Marksman's word mark "Marksman" is distinctive, satisfying factor nine.  *See* 15 U.S.C. §§ 1125(d)(1)(B)(i)(IX).

Eight of the nine statutory factors point to the irrebuttable conclusion Platinum had a bad faith intent to profit off Marksman's Marks in registering the Infringing Domains containing Marksman's word mark and redirecting traffic from them to Platinum's own website.

### 2.  Additional evidence of Platinum's bad faith intent abounds.

Further demonstrating Platinum's bad faith is the fact its illicit use of Marksman's word mark in the Infringing Domains was just but one prong of Platinum's online attack to harm Marksman's reputation and steal customers from Marksman.   In March of 2018, Platinum registered the Infringing Domains. [SMF ¶ 28].   On September 17, 2018, two months after Platinum launched the Imposter Instagram, Mr. Van Middlesworth instructed a friend to make sure he found a way to let Mr. Radi know how successful Mr. Van Middlesworth had become because he "rally hate[s]" Mr. Radi, writing: "Next time you hear from him be like yeah Kevin bought some 7 million dollar house. Want it to get back to Mark. I really hate those fags." [SMF ¶ 23].  On August 5, 2020, a month after Platinum and Mr. Underwood began paying people to post fake reviews on Google, Mr. Joseph wrote to Mr. Van Middlesworth: "Also a reminder that we need to get out of this scum business . . . people like Zeke and Mark are cum stains that need to be wiped

out" [SMF ¶ 24].[9]  Mr. Joseph confirmed "Zeke and Mark" referred to the CEO and President and founder of Marksman. [SMF ¶ 24] and that "wipe them out," refers "[p]robably just get more accounts, beat them, that kind of sense, from a business standpoint, maybe." *Id.*  Mr. Joseph also confirmed Platinum "contributes" to private security being what he called a "scum business." [SMF ¶ 53].  He went on to confirm "using one company's name and domain names and redirecting them to your own website," "creating an imposter Instagram account using your competitor's trademarks and posting negative articles on it," "paying people to post reviews on Google about your private security business" are all activities that "could be" contributing to "private security being a scum business."  *Id.* When asked to confirm "those are all activities that Platinum engaged in as to Marksman," Mr. Joseph, replied: "If you say so.  That's what we know of right now."  *Id.* But there was more.

At the same time Mr. Joseph was purchasing and having the Infringing Domains redirected to Platinum's website, he was creating an account on the online job board Indeed.com and posting information on Marksman's page on that site.  [SMF ¶ 43].  Although Mr. Joseph claimed not to recall submitting a review of Marksman on Indeed.com, he could not explain why his internet history obtained through the court-ordered forensic review of his computer revealed a confirmation page for having submitted a review.  [SMF ¶ 43].

Platinum has continued to demonstrate its bad faith during this lawsuit.  Indeed, as fully described in Marksman's Motion for Default Judgment on Certain Counts as a Sanction for [Platinum's] Spoliation of Evidence, Platinum has engaged in egregious conduct before the Court in an attempt to cover its tracks and hide evidence of the damage caused by its efforts to profit of Marksman's Mark and otherwise harm Marksman.  [*See* ECF No. 136].

This Court has previously stated "if a defendant's intent to derive benefit from a plaintiff's distinctive mark is clear and unrebutted by evidence to the contrary, intent alone, without consideration of the other facts, may support a finding of trademark infringement." *Victoria's Cyber Secret*, 161 F. Supp. 2d at 1352 (internal citations omitted).  Here, Platinum's bad faith

---

[9] This is but one of the text messages both Mr. Joseph and Mr. Van Middlesworth attempted to delete.  Mr. Joseph was successful.  Although Mr. Van Middlesworth deleted the message from his phone, it was uncovered through a court-ordered forensic extraction of Mr. Van Middlesworth's iCloud backup.  [SMF ¶¶ 22, 24].

intent to harm Marksman and derive a benefit from Marksman's Marks is "clear" and cannot be rebutted.  Accordingly, the Court should find Platinum infringed on Marksman's Marks.[10]

### E. Marksman is entitled to an award of Platinum's profits.

Marksman is entitled to the recovery of Platinum's profits during the infringing period between March 2018 and December 2020.[11]  As set forth in 15 U.S.C. § 1117(a), "the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." In the Eleventh Circuit, it is "well settled that a plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits under § 35 of the Lanham Act." *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1288 (S.D. Fla. 2010) (awarding the entire amount of the infringing defendant's gross sales even though such amounts were a "windfall" to the plaintiff). The U.S. Supreme Court has pronounced that in awarding an infringer's profits, "[t]here may well be a windfall to the trademark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 207 (1942). That is because an award of an infringer's profits "further[s] the congressional purpose by making infringement unprofitable, and is justified

---

[10] "The ACPA has a safe harbor provision which provides that bad faith intent 'shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful.'" *Victoria's Cyber Secret*, 161 F. Supp. 2d at 1353 (quoting 15 U.S.C. §1125(d)(1)(B)(ii)).  Platinum has raised "fair use" as an affirmative defense. [ECF No. 60 at p. 9]. However, "'[a] defendant who acts even *partially* in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the [ACPA's] safe harbor provision.'" *Victoria's Cyber Secret*, 161 F. Supp. 2d at 1353 (internal citation omitted).  Because Platinum acted in bad faith, it cannot rely, and Marksman is entitled to summary judgment, on Platinum's "fair use" affirmative defense.  *See id.*

[11] The Imposter Instagram using Marksman's Marks was removed from Instagram and deleted sometime before October 8, 2020, when Platinum's CFO was deposed and testified she deleted it "on advice of counsel."  [SMF ¶ 59]. She could not, however, identify precisely when she deleted it and did not maintain any records to identify the date.  *Id.* Platinum has sworn it no longer owns the Infringing Domains and they are no longer redirecting traffic to its website, but it could not identify when it stopped doing so except to claim it was sometime after this lawsuit was brought. [SMF ¶ 58].

because it deprives the defendant of unjust enrichment and provides a deterrent to similar activity in the future." *Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988).

To demonstrate entitlement to the recovery of Platinum's profits, Marksman must merely establish that ***any of these three*** circumstances exist: "(1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, ***or*** (3) it is necessary to deter future conduct." *Drew Est. Holding Co. v. Fantasia Distribution, Inc.*, No. 11-21900-CIV, 2012 WL 12866791, at *1 (S.D. Fla. Aug. 28, 2012) (emphasis supplied). Here, all three exist.

An infringer's conduct is willful where the infringer "knowingly and deliberately cash[ed] in upon the good will" of the trademark holder. *Burger King Corp.*, 855 F.2d at 781. Here, as set forth above, Platinum's conduct was undoubtedly "willful" and in "bad faith" and designed to "cash in" on Marksman's goodwill. Indeed, Platinum admitted it selected the Infringing Domains precisely because they are similar to Marksman's website's domain and word mark. [SMF ¶ 31]. Platinum further admitted the purpose of using the intentionally confusingly similar Infringing Domains was "***to drive traffic to our website***" and doing so was "***our way of redirecting some business our way***." *Id.* ¶ 32.

Platinum was "unjustly enriched." *See Drew Est. Holding Co*., 2012 WL 12866791, at *1 ("'Unjust enrichment occurs when an infringer has "enriched [itself] by tapping the reputation and good will of [the infringed].'"') (citation omitted). Three months after registering and redirecting the Infringing Domains to its own website, Mr. Van Middlesworth confirmed Platinum had taken from Marksman "6 accounts in 60 days." [SMF ¶ 56]. From the time Platinum registered the Infringing Domains, through the time Platinum launched the Imposter Instagram, and to December 2020, Platinum's revenue steadily increased by over 50%. [JSUF ¶¶ 15-17].

Finally, an award of profits is necessary to deter future bad conduct by Platinum. Platinum's animosity towards Marksman and its founder is well documented and persistent. Platinum was not deterred when it was caught and sued. Platinum lied during its corporate representative deposition taken in the Bill of Discovery Action when it claimed to have no knowledge of the Imposter Instagram. [SMF ¶ 55]. Once sued in this action, Platinum deliberately destroyed and failed to maintain or search for evidence. [SMF ¶¶ 21-25, 40-42; *see also* ECF No. 136]. Even *after* Marksman brought its original claims in this case regarding the Imposter Instagram and Infringing Domains, Platinum *continued* its online attack campaign when it began to pay people to post fake reviews on Google. [JSUF ¶¶ 12-14; SMF ¶ 44-52]. Accordingly,

Platinum has demonstrated its infringement and other bad acts directed towards Marksman will not be deterred absent an award of profits in favor of Marksman.  *See Nutrivida, Inc. v. Inmuno Vital, Inc.,* 46 F. Supp. 2d 1310, 1313 (S.D. Fla. 1998) (finding plaintiff was "entitled to the disgorgement of [the infringer's] ill-gotten gains as compensation for [the infringer's] acts and to deter similar acts of unjust enrichment in the future.").

In short, here an award of Platinum's profits "further[s] the congressional purpose by making infringement unprofitable, and is justified because it deprives [Platinum] of unjust enrichment and provides a deterrent to similar activity in the future." *See Burger King Corp.*, 855 F.2d at 781.

"In order to establish the amount of profits to be disgorged [from the infringer], a plaintiff must establish the infringer's gross sales of the product; it is then up to the defendant to refute that amount, and/or to proffer costs that should be deducted from the gross sales." *Tiramisu Int'l*, 741 F. Supp. 2d at 1290. The Court expressly recognized and informed Platinum of this principal of law in its April 29, 2021, Order stating: "Under the Lanham Act, Plaintiff is required to establish Defendant's gross sales, not Defendant's infringing gross sales" and "if a defendant fails its statutory duty to offer evidence of deduction, then the plaintiff is entitled to gross profit." [ECF No. 127 p. 3 (citing *Tiramisu Int'l*, 741 F. Supp. 2d at 1291)].  Accordingly, the Court found "Plaintiff is entitled to a list of Defendant's new customers during the time of the alleged infringement, as well as Defendant's gross sales during the same time frame," and "Plaintiff must have access to financial information that details Defendants' gross sales from March 1, 2018 through December 31, 2020," and, therefore, ordered Platinum to produce that information.  *Id.* Platinum did so.  [JSUF ¶¶ 15-17; SMF ¶ 57].  According to Platinum, its gross sales during the infringing period are $61,512,285.02.  [JSUF ¶¶ 15-17].  Marksman has, therefore, satisfied its burden to show Platinum's "gross sales."

Platinum has come forward with no evidence of "deductions."  After explaining during the hearing on Marksman's Motion to Compel and in its Order the requirement for the defendant to present evidence of deductions to gross sales, the Court ordered Platinum to produce "any documents and communications from March 1, 2018 to December 31, 2020, between you and any representative of any new accounts acquired or that began servicing by Plaintiff during this time period that will be relied upon to prove any deductions to gross sales during the alleged

infringement period." [ECF No. 127 p. 5]. In response, Platinum confirmed it had no documents or communications to support deductions. [SMF ¶ 63].

Because Platinum has not and cannot now come forward with any evidence of deductions from gross sales, the profits to which Marksman is entitled are equal to Platinum's gross sales. *See Tiramisu Int'l*, 741 F. Supp. 2d at 1291 (when "the infringer fails to carry its statutory burden to offer evidence of deductions, the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's gross sales.'" (citations omitted)). There are no issues of material fact to preclude entry of judgment in Marksman's favor on Count I of Marksman's Second Amended Complaint entitling Marksman to a disgorgement of Platinum's profits in the amount of $61,512,285.02.[12]

### F.  *Marksman is entitled to a permanent injunction against Platinum pursuant to 15 U.S.C. § 1116(a).*

Pursuant to 15 U.S.C. § 1116(a), courts have the power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent violations of 15 U.S.C. § 1125(d). To be entitled to injunctive relief, Marksman must establish the following four elements: "(1) irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and 4) that the public interest would not be disserved by a permanent injunction." *DC Comics v. G5 Barbers, LLC*, No. 6:11-CV-1600-ORL-36, 2012 WL 4328610, at *8 (M.D. Fla. Aug. 22, 2012). Each element is met here.

---

[12] In the event that the Court finds Marksman is not entitled to recover Platinum's profits, Marksman alternatively seeks statutory damages against Platinum pursuant to 15 U.S.C. § 1117(d) in an amount not less than $1,000 and not more than $100,000 per infringing domain name, as the court considers just. District courts have wide discretion in awarding statutory damages pursuant to § 1117(d). *Le Paradis Latin SA v. Paradis Latin, Inc.*, No. 10-22555-CIV, 2011 WL 13220781, at *6 (S.D. Fla. Feb. 4, 2011). "This statutory damage provision serves to deter wrongful conduct and to provide adequate remedies for trademark owners who seek to enforce their rights in court." *Id*. (citation and internal quotations omitted). In cases involving willful and deliberate misconduct, like here, "many courts have imposed the statutory maximum" of $100,000. *Id*. at *18 (awarding $100,000 per domain name and citing cases doing the same). Here, as the record demonstrates, Platinum's behavior in the use of the Infringing Domains, its comprehensive attack against Marksman's business borne out of spite, and its improper efforts to conceal its wrongdoing, including *after* the initiation of this lawsuit, warrants the maximum available award of $100,000.00 per domain name for a total of $600,000.00.

Marksman will suffer irreparable injury for which there are no adequate remedies available at law if Platinum is permitted to continue utilizing Marksman's Marks in violation of 15 U.S.C. § 1125(d). *See DC Comics*, 2012 WL 4328610, at *7-9 (finding irreparable injury arising from the defendant's use of a domain name infringing upon the plaintiff's trademarks); *Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1509-1510 (S.D. Fla. 1995) (stating, "injunctive relief is the remedy of choice for trademark and unfair competition cases").

Next, the balance of hardships weighs overwhelmingly in Marksman's favor. Platinum will suffer no hardship whatsoever if a permanent injunction is entered ordering Platinum to cease and desist any present or future use of Marksman's Marks or any names confusingly similar thereto. On the other hand, Marksman will suffer significant hardship and irreparable injury if Platinum is permitted to continue using Marksman's Marks or names confusingly similar thereto.

Finally, the public interest weighs strongly in favor of a permanent injunction against Platinum to keep it from using Marksman's Marks in a manner that will be confusing to consumers and harmful to Marksman. *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1353 (11th Cir. 2019) (stating that injunctive relief is the surest way to prevent future harm and that the public deserves not to be led astray by the use of inevitably confusing marks) (citations omitted); *DC Comics*, 2012 WL 4328610, at *7-9 (stating courts have generally recognized trademark infringement encroaches on the right of the public to be free from confusion as well as the synonymous right of the trademark owner to control his or her products' reputation).

Accordingly, in addition to awarding Marksman damages, the Court should enter a permanent injunction prohibiting Platinum and all persons acting in concert or participation with it from all present or future use of Marksman's Marks and any names confusingly similar to Marksman's Marks. *See PetMed Express*, 336 F. Supp. 2d at 1223 (entering a similar permanent injunction against a party that violated 15 U.S.C. § 1125(d)).

## II.   Marksman is Entitled to Summary Judgment Against Platinum and Underwood on Marksman's Claims Regarding the Fake Reviews, Counts II, IV and VI.

By its Counts II, IV, and VI, Marksman alleges Platinum and Underwood engaged in federal and common law unfair competition and violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stats. § 501.201 *et seq.* ("**FDUTPA**"), by paying people to post false reviews online about Platinum. Federal claims for unfair competition under the Lanham Act, common law claims for Unfair Competition, and claims for unfair competition brought under FDUTPA may be analyzed simultaneously. *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d

1340, 1362 (S.D. Fla. 2017) (finding the legal analysis for Lanham Act claims applies to state law claims for unfair competition and FDUTPA and further granting summary judgment on the counter-plaintiff's state law claims after granting summary judgment on its Lanham Act claims).

The federal unfair competition statute, 15 U.S.C. § 1125(a), prohibits "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." For a representation to constitute "commercial advertising or promotion," the representation must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry. [ECF No. 48 (Order on Motion to Dismiss) p. 7 (citing *Suntree Techs., Inc. v. Ecosense Intern., Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012))]. "Commercial speech encompasses not merely direct invitations to trade, but also communications designed to advance business interests." *Matonis v. Care Holdings Grp., L.L.C.*, 423 F. Supp. 3d 1304, 1313 (S.D. Fla. 2019) (internal citations omitted). The Eleventh Circuit has interpreted 15 U.S.C. §1125(a) to further require a plaintiff to demonstrate:

> (1) the defendant's statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumers' purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) it has been, or likely will be, injured as a result of the false or misleading statement.

*Sovereign Military Hospitaller Order of St. John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Order of St. John of Jerusalem, Knights of Malta, the Ecumenical Order*, 702 F.3d 1279, 1294 (11th Cir. 2012).

Here, Platinum and Underwood engaged in "commercial advertising or promotion," in paying people to post online fake reviews of Platinum on Google, accessible to anyone in the world. [JSUF ¶ 12]. Marksman and Platinum are in competition. [JSUF ¶ 5]. The intent of Platinum's and Underwood's scheme to pay for positive online reviews was to improve Platinum's image and attract customers by raising Platinum's star rating on Google. [SMF ¶ 52]. Accordingly, Platinum and Underwood engaged in commercial advertising or promotion. *See Suntree Techs.*, 693 F.3d at 1349.

Further, each element necessary to establish a claim under 15 U.S.C. § 1125(a) as set out in *Sovereign Military Hosp.* is satisfied. 702 F. 3d at 1279. First, at least three of the fake reviews were and are literally false in that the reviewers never lived in a building serviced by Platinum or worked for Platinum, as they claimed in their reviews. [SMF ¶¶ 49, 50]. Because Platinum and Underwood caused "literally false" reviews to be posted, the element requiring that the fake reviews deceived or had the capacity to deceive consumers is satisfied. *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (stating that "once a court deems an advertisement to be literally false, the movant need not present evidence of consumer deception").

The elements regarding materiality and interstate commerce are also satisfied. To establish materiality, a plaintiff "must demonstrate that the defendant's deception is likely to influence the purchasing decision." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010) (citation and internal quotations omitted). A plaintiff may make the necessary demonstration by showing that "the defendants misrepresented an inherent quality or characteristic of the product." *Id*. (citation and internal quotations omitted). Here, the fake reviews go directly to the inherent quality of Platinum's services, referring to Platinum as "the best," a "great company," a "[g]reat company to work for," and asserting, among other things, that Platinum has kept the reviewers' buildings "safe and comfortable." [SMF ¶ 47 & Exhibit 3 at Ex. A]. *See Osmose, Inc.*, 612 F.3d at 1319 (observing that the materiality of a statement may be self-evident).

Finally, Marksman has been and likely will be injured as a result of the false reviews. As Platinum and Underwood themselves have stated, positive reviews on Google are an important means of attracting customers. [SMF ¶ 52]. Thus, because Marksman and Platinum are direct competitors, Marksman is likely to be damaged as a result of Defendants' actions. [*See* ECF No. 48 p. 10-11 (noting that posting false reviews online may suppress real reviews and deprive customers of accurate information)]. Lastly, Marksman has incurred costs associated with preventing Defendants' future misconduct pursuing this action. Therefore, the element of likely harm is satisfied. *See Tracfone Wireless, Inc. v. Adams*, 98 F. Supp. 3d 1243, 1258-1259 (S.D. Fla. 2015) (finding that the plaintiff had been injured because it lost out on sales and incurred costs associated with preventing the defendant's future misconduct and in pursuing the action).

Like its first Count related to the Infringing Domains, Marksman brings its Count II claim for Unfair Competition related to the fake reviews pursuant to the Lanham Act. Accordingly, the

same measure damages—disgorgement of Platinum's "profits"—is available under 15 U.S.C. § 1117(a). The fake reviews began in January 2020. [SMF ¶ 44]. Platinum's gross revenue from January 2020 through December 2020 was $24,564,954.60. [JSUF ¶ 17]. Platinum has not produced and cannot come forward now with any evidence of "deductions." [SMF ¶ 63]. Accordingly, there is no issue of material fact to preclude judgment on Count II in favor of Marksman in the amount of $ 24,564,954.60.

Moreover, for the same reasons Marksman is entitled to injunctive relief under Count I against Platinum, Marksman is entitled under Count II to a permanent injunction barring Platinum and Underwood from paying for and disseminating fake reviews.

Because Marksman is entitled to judgment on its Lanham Act claim for unfair competition, the Court should also grant summary judgment as to liability on Marksman's state law claims unfair competition (Count IV) and FDUTPA (Count VI). *See Casa Dimitri Corp.*, 270 F. Supp. 3d at 1362 (S.D. Fla. 2017).

<u>**CONCLUSION**</u>

For the foregoing reasons, Marksman Security Corporation requests the Court: (1) enter summary judgment against Platinum on Count I and require Platinum to disgorge its profits in the amount of $61,512,285.02; (2) enter summary judgment on liability against Platinum and Underwood on Counts II, IV, and VI and, if all profits are not awarded under Count I, requiring Platinum to disgorge profits in the amount of $24,564,954.60 under Count II; (3) provide the injunctive relief to Marksman as requested herein; (4) enter an order entitling Marksman to, or reserving jurisdiction to consider an application by Marksman for, attorneys' fees and costs pursuant to 15 U.S.C. 1117(a)[13] and Fla. Stats. 501.2105; and (5) provide all other and further relief the Court deems appropriate in the circumstances.

---

[13] The Lanham Act provides for an award of attorneys' fees in "exceptional cases." 15 U.S.C. § 1117. "The Eleventh Circuit has defined an exceptional case as a case that can be characterized as malicious, fraudulent, deliberate and willful . .  or a case where there is 'evidence of fraud or bad faith.'" *Victoria's Cyber Secret*, 161 F. Supp. 2d at 1356 (awarding attorneys' fees to trademark holder prevailing on "Cybersquatting" claims where court found infringer acted willfully and in bad faith) (internal citations omitted). "The determination of whether to award fees and costs in exceptional cases is within the sole discretion of the court. *Id.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 11, 2021 a true and correct copy of the foregoing was served by the Court's CM/ECF which will send a notice of electronic filing to all CM/ECF registered parties, including: **Kendrick Almaguer, Esquire, Peter Ticktin, Esquire and Jamie A. Sasson, Esquire**, The Ticktin Law Group, 270 SW Natura Avenue, Deerfield Beach, FL 33441, serv518@legalbrains.com, serv512@legalbrains.com; serv513@legalbrains.com, and **Gerard S. Collins, Esquire**, Kaye Bender Rembaum, 1200 Park Central Blvd. South, Pompano Beach, FL 33064, gcollins@kbrlegal.com.

Respectfully submitted,

*/s/ E. Colin Thompson*
E. COLIN THOMPSON
Florida Bar No.: 0684929
colint@sblfirm.com
loisf@sblfirm.com
heatherw@sblfirm.com
SEAN M. McCLEARY
Florida Bar No.: 117832
seanm@sblfirm.com
paulam@sblfirm.com
**SMOLKER, BARTLETT, LOEB, HINDS & THOMPSON, P.A.**
100 North Tampa Street, Suite 2050
Tampa, Florida 33602
Telephone: 813-223-3888

*Attorneys for Plaintiff, Marksman Security Corporation*